IN RE H.H. AND R.H.

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-05-093-CV

IN THE INTEREST OF H.H. AND R.H., CHILDREN 

------------

FROM THE 97TH DISTRICT COURT OF MONTAGUE COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I. Introduction

Appellant Robert H. appeals the trial court’s order terminating his parental rights to his children, H.H. and R.H.  In two issues, Robert argues that the evidence is legally and factually insufficient: (1) to support termination of his parental rights under any of the grounds found by the jury and (2) to support the jury’s finding that termination of his parental rights is in the best interest of H.H. and R.H.
(footnote: 2)  We affirm.

II. Factual and Procedural Background

Robert and Amy began their relationship in 1993 and married a few years later, while Robert was incarcerated in Denton County Jail.  Amy has three other children besides H.H. and R.H.:  J.L., J.V., and T.V.  Amy gave custody of her oldest son, J.L., to her father when J.L. was eight months old.  J.L. now lives in Memphis, Tennessee with a non-relative.  Amy has not seen him since he was two years old.
  J.V. 
and T.V. live with Amy’s mother in Saint Jo, Texas.  J.V. is seventeen and on probation for sexually assaulting H.H. and R.H.  

In October 2003, the Texas Department of Protective and Regulatory Services
(footnote: 3) (the Department) received a referral alleging that Amy’s live-in boyfriend, Randy Bryce, had sexually abused H.H.  At the time the Department received the referral, H.H. and R.H. were living at the home of their maternal grandmother, Kathryn LaComb.  When the Department sent an agent to LaComb’s home to investigate, the agent discovered that Amy had not been home with the children for a few days.  

The Department had received other referrals regarding H.H. and R.H. in the past.  Specifically, one referral in April 2003 alleged that J.V. had sexually assaulted R.H. and H.H. while under the supervision of H.H.’s paternal grandmother, Bobbie Caldwell.  Additional referrals alleged that Robert had abused H.H.; that LaComb had physically abused J.V., H.H., and R.H; and that Caldwell had failed to properly supervise H.H. and R.H. 

On October 13, 2003, the trial court allowed the Department to remove the children from LaComb’s home, placed them in foster care, and set a hearing regarding conservatorship and termination of the parent-child relationship.  At the time of the children’s removal, Robert was incarcerated in the Denton County Jail for burglary.  

H.H. and R.H. were still in foster care at the time of the trial.  H.H. was ten years old, and R.H. was nine years old.  After a four-day trial, the jury found that Robert had

1. knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children;

2. engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children;

3.   constructively abandoned the children; and

4.   failed to comply with the provisions of a court order that specifically established the actions necessary for the father to obtain the return of the children.
(footnote: 4) 

The jury also found that termination of Robert’s parental rights would be in the children’s best interest.
(footnote: 5)  The trial court rendered judgment on the jury’s verdict, and this appeal followed.

III. Standards of Review

A parent’s rights to “‘the companionship, care, custody, and management’” of his children are constitutional interests “far more precious than any property right.”
(footnote: 6)  In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child’s right to inherit.
(footnote: 7)  
Nonetheless, while parental rights are of constitutional magnitude, they are not absolute.
(footnote: 8)  Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.
(footnote: 9)
 In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child.
(footnote: 10)   Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.
(footnote: 11)  Because of the elevated status of parental rights, the quantum of proof required in a termination proceeding is elevated from the preponderance of the evidence to clear and convincing evidence.
(footnote: 12)
 Clear and convincing evidence is “the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.”
(footnote: 13)  This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings.
(footnote: 14)  
While the proof must be more than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed.
(footnote: 15)  Termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent.
(footnote: 16) 

IV. Evidence Regarding Endangering Conduct

Robert asserts in his first and second issues that the evidence is legally and factually insufficient to support the jury’s finding that he engaged in conduct that endangered the physical or emotional well-being of H.H. and R.H. He argues that evidence of his criminal behavior from the 1980s is too remote to support a finding on the endangering ground.  Robert also contends that evidence of more than a single act or omission is required to justify termination of parental rights under section 161.001 and that no course of endangering conduct was proven to exist during the Department’s involvement.

Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act.
(footnote: 17) Endangerment under this section must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.
(footnote: 18)  It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury.
(footnote: 19)  

To determine whether termination is necessary, courts look to parental conduct both before and after the child's birth.
(footnote: 20)  A parent’s past endangering conduct may create an inference that the parent’s past conduct may recur and further jeopardize a child’s present or future physical or emotional well-being.
(footnote: 21) 

Drug addiction and its effect on a parent's life and ability to parent may establish an endangering course of conduct.
(footnote: 22)  A parent’s decision to engage in illegal drug use during the pendency of a termination suit, when the parent was at risk of losing a child, supports a finding that the parent engaged in conduct that endangered the child’s physical or emotional well-being.
(footnote: 23) 

Evidence of criminal conduct, convictions, and imprisonment prior to the birth of a child will support a finding that a parent engaged in a course of conduct that endangered the child’s well-being.
(footnote: 24)  While imprisonment alone does not constitute a continuing course of conduct that endangers the physical or emotional well-being of a child, however, it is a fact properly considered on the issue of endangerment.
(footnote: 25)  

The record contains the following evidence of Robert’s endangering conduct:

During trial, Robert stated, “I am an addict.  I am always going to be an addict.”  Robert began using methamphetamine and cocaine in 1993, when he was thirty-five.  He admitted that he used to shoot up methamphetamine, that he and Amy used drugs together throughout their marriage, that he and Amy used drugs while the children were in their home, and that he has been under the influence of drugs while he was around H.H. and R.H.  Robert further testified that H.H. walked in on him in the bathroom “as I was fixing to shoot a needle, but she did not see nothing.” 

Robert said that he last used marijuana and cocaine in May 2004, after the children were in foster care and while he was on parole.  He admitted he had been ordered by his service plan and by the trial court not to use any illegal substances.  He further admitted at trial that he lied to the Department about his cocaine use in January or February 2004.  Robert stated that he relapsed into drug use in May 2004 and had a “dirty UA” for marijuana and cocaine.  
He said that he used drugs at that time because he “just wanted to get high” and not because his need to get high was so overpowering that he could not control it.  He admitted he wanted to get high even knowing there was a risk involving his children and his parole.  

The record shows that Robert has an extensive criminal history beginning in 1975 and continuing until November 15, 2004.  He has been incarcerated for the majority of his children’s lives.  
His criminal background includes at least five convictions for burglary, convictions for escape and evading arrest, and five parole revocations.  He is still on parole for a 1982 conviction for burglary of a building because his parole on this sentence has been revoked three or four separate times for parole violations and the commission of new offenses. Robert also stated that he had been incarcerated for evading arrest prior to his escape from jail in 1997.  

At the time of trial, Robert was in the Denton County Jail on a parole violation for possession of stolen property and on a charge of burglary of a building, which was committed on November 15, 2004.  He admitted that he suspected the materials were stolen, that he knew receiving stolen property is a felony, and that he knew he could get his parole revoked and go back to prison for possession of stolen property and burglary of a building.  When counsel asked him why he would risk getting locked up again for buying the stolen property, Robert responded, “Truthfully, I didn’t think I was going to get caught.”  When discussing his incarceration and its effects on his children, he stated, “I’m at fault because I was locked up. I wasn’t there for my kids for what happened to them.”  He further admitted, “It has hurt him [R.H.] over the years with me being locked up.”

The record also shows that Robert has a cavalier attitude about his criminal history and has even encouraged criminal behavior in his children.  At trial he confessed, “Three convictions in the penitentiary is not to me a major thing.”  In a letter to Amy after he completed a parenting class, he wrote, “[H.H.] got caught sneaking and calling me on the foster mom’s cell phone, so I got a cell phone turned on for her to call me. She keeps it hid.  Think she isn’t smart?  A baby crook.  She has got good blood.”

We hold that the evidence is both legally and factually sufficient to support a jury’s finding of endangerment under section 161.001(1)(E).
(footnote: 26)
V. Evidence Regarding Best Interest

Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(1) the desires of the child;

(2) the emotional and physical needs of the child now and in the future; 

(3) the emotional and physical danger to the child now and in the future; 

(4) the parental abilities of the individuals seeking custody; 

(5) the programs available to assist these individuals to promote the best interest of the child;

(6) the plans for the child by these individuals or by the agency seeking custody;

(7) the stability of the home or proposed placement;

(8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(9) any excuse for the acts or omissions of the parent.
(footnote: 27)

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.
(footnote: 28)  Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the children.
(footnote: 29) 
 On the other hand, the presence of scant evidence relevant to each 
Holley
 factor will not support such a finding.
(footnote: 30)  

We now address the 
Holley
 factors for which relevant evidence was admitted. 

A. Desires of the Children

Carol Morath, the children’s guardian ad litem, testified that neither H.H. nor R.H. wanted to be with Robert.  The children told Morath that Robert was mean, and one or both of them told her they thought he was still in jail. 

B. The Emotional and Physical Needs of the Children Now and in the Future

Darlene Hall, a caseworker with the Department, testified that H.H. has an anger management problem and “strikes out” when she does not get her way.  H.H. has been moved from foster placements because of her bad behavior.  H.H. has been in therapy to deal with her issues and Hall testified that H.H. will need long-term therapy to deal with emotional issues caused by her sexual abuse. 

R.H. is also in therapy.  R.H. suffers from encropesis, an inability to control his bodily functions.  When R.H. first came into the Department’s care, he was unable to control his bodily functions up to four or five times a day. R.H.’s condition is improving, but Hall testified that R.H. will need long-term therapy.

C. Emotional and Physical Danger to the Children Now and in the Future

Robert has been incarcerated for the majority of his children’s lives and has an extensive history of drug abuse.
 
 The record also reveals that Robert has had a history of domestic violence and physically abused Amy and other members of his family.  Robert admitted that H.H. had seen him hit Amy at least twice.  Robert also admitted that Amy was in an “abusive” relationship with him, that he blackened both of her eyes once, and that he slapped her open handed and with a closed fist.  Robert further admitted that a pattern of physical violence and drug use existed throughout his marriage to Amy and that the drug use caused the fights.  Amy testified that Robert had been physically abusive toward R.H., his mother, his brothers, and Amy’s brothers.  Amy stated that these physical altercations happened when Robert, Amy, H.H., and R.H. lived with Caldwell. 

D. Parental Abilities of the Individual Seeking Custody

Robert’s parental abilities are virtually non-existent.  Although he did present evidence of having completed some parenting classes, he has not shown an ability to meet the physical and emotional needs of his children. Because of his repeated criminal conduct and parole violations, Robert has been in prison or jail for all but three or four years of his children’s lifetimes.  And, for the periods that Robert was out of jail, he was frequently under the influence of drugs, and H.H. and R.H. witnessed his violent behavior with their mother.  In discussing his incarceration and its effects on his children, Robert admitted, “I’m at fault because I was locked up.  I wasn’t there for my kids for what happened to them.”  Robert admitted that he had a “long ways to go” before he would be ready to have the children placed with him. 

Further, as a result of Robert’s repeated absences from his children’s lives, Robert has failed to meet his parental responsibilities in the past by allowing others to assume the custody and care of his children.  H.H. and R.H. lived with Caldwell, Robert’s mother, during many of the times either Robert or Amy, or both of them, were incarcerated.  Caldwell had previously been convicted of selling drugs.  A number of convicted felons “wandered in and out” of Caldwell’s house while the children were there.  Also, when R.H. told his therapist that J.V. had molested him and H.H., the children were living in Caldwell’s home.  Caldwell was aware of the sexual abuse, but she did not contact the Department because she feared the children would be removed from her home.  

E. Plans for the Children by the Individual Seeking Custody

Hall testified that the Department planned for H.H. and R.H. to be adopted together and that they were adoptable.  At the time of trial, Robert was in jail and faced a possible parole revocation and criminal conviction. Robert wanted H.H. and R.H. placed with Caldwell until he was released from jail or prison, and then he planned to move with the children to Arizona and to work driving a wrecker.

F. Acts or Omissions of the Parent

 When Robert met with Hall to discuss the service plan and with hopes of eventually reuniting with his children, Hall stated that Robert seemed to be anxious to start working his plan and to see his children.  Although Robert told Hall that he set up counseling, parenting, and drug addiction classes in an effort to comply with his service plan, Hall stated that she later discovered that Robert had lied about attending the classes.  During that same time, Robert called Hall to cancel one of his visitation sessions with his children because it conflicted with one of the counseling sessions Hall believed he was attending. After Hall confronted Robert about misleading her, Robert admitted to Hall that he had lied and that he knew he had “screwed up.”  Robert then promised Hall he would improve.  

Although Hall continued to work with Robert after he had lied to her, she testified that Robert’s attitude towards her changed.  Hall testified that it was the first time she felt he could become hostile or aggressive with her.  Robert then started making fewer contacts with Hall, started coming to fewer visits, and eventually stopped showing up for visits and for court hearings.  By July 2004, Hall testified that the Department’s plan for reunification had changed to a concurrent plan to continue to reunify but to terminate parental rights if reunification did not work.  

Hall then testified that Robert requested a home visit from her on September 15, 2004.  But when Hall arrived at Caldwell’s house, where Robert lived, Robert was not there.  Hall did not see Robert, nor did she receive documentation concerning his whereabouts between September 2004 and the termination trial in February 2005.  Robert underwent surgery in September 2004.  Hall received one phone call from him in October 2004, during which he mentioned having transportation problems.  Hall offered to help Robert find transportation, but Robert told her that he did not need her help.

We hold that the evidence is legally and factually sufficient to sustain the jury’s finding that termination of Robert’s parental rights to R.H. and H.H. is in the children’s best interest.
(footnote: 31)  Accordingly, we overrule Robert’s issues.  

VI. Conclusion

Having overruled each of Robert’s issues on appeal, we affirm the trial court’s judgment.  

PER CURIAM

PANEL A: CAYCE, C.J.; HOLMAN and MCCOY, JJ.

DELIVERED:  January 26, 2006

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
Amy H., H.H. and R.H.’s mother and Robert H.’s wife, was a party below but did not appeal the trial court’s termination order.

3:
This agency is now known as the Department of Family and Protective Services. 
Tex. Fam. Code Ann.
 § 261.001(2) (Vernon Supp. 2005). 

4:
See 
Tex. Fam. Code Ann
. § 
161.001(D), (E), (N), (O). 

5:
See id.
 § 161.001(2).

6:
Santosky v. Kramer
, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982);
 
In re M.S.
, 115 S.W.3d 534, 547 (Tex. 2003). 

7:
T
EX
. F
AM
. C
ODE
 A
NN
. § 161.206(b); 
Holick v. Smith
, 685 S.W.2d 18, 20 (Tex. 1985). 

8:
In re C.H.
, 89 S.W.3d 17, 26 (Tex. 2002)
.

9:
Id.
 

10:
T
EX.
 F
AM.
 C
ODE
 A
NN.
 § 161.001
; 
In re J.L.
, 163 S.W.3d 79, 84 (Tex. 2005).
 

11:
Tex. Dep’t of Human Servs. v. Boyd
, 727 S.W.2d 531, 533 (Tex. 1987).

12:
Santosky
, 455 U.S. at 746, 102 S. Ct. at 1391; 
see also 
Tex. Fam. Code Ann.
 § 161.001.  

13:
Tex. Fam. Code Ann.
 § 101.007 (Vernon 2002).

14:
In re G.M.
, 596 S.W.2d 846, 847 (Tex. 1980); 
In re K.W.
, 138 S.W.3d 420, 425 (Tex. App.—Fort Worth 2004, pet. denied). 

15:
State v. Addington,
 588 S.W.2d 569, 570 (Tex. 1979); 
In re D.T.
, 34 S.W.3d 625, 630 (Tex. App.—Fort Worth 2001, pet. denied) (op. on reh’g). 

16:
Holick
, 685 S.W.2d at 20-21; 
In re A.V.
, 849 S.W.2d 393, 400 (Tex. App.—Fort Worth 1993, no writ).

17:
In re R.D.
, 955 S.W.2d 364, 368 (Tex. App.—San Antonio 1997, pet. denied); 
Dupree v. Tex. Dep't of Protective & Regulatory Servs.
, 907 S.W.2d 81, 83-84 (Tex. App.—Dallas 1995, no writ). 

18:
T
EX
. F
AM
. C
ODE
 A
NN
. § 161.001(1)(E);  
D.T.
, 34 S.W.3d at 634;
 In re K.M.M.
, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.).

19:
Boyd
, 727 S.W.2d at 533.   

20:
In re D.M.
, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.)

21:
See id.

22:
In re R.W.
, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied); 
In re J.T.G.
, 
121 S.W.3d 117, 125-26 (Tex. App.—Fort Worth 2003, no pet.);
 
Dupree
, 907 S.W.2d at 84. 

23:
In re J.J.O.
, No. 2-03-00267-CV, 2004 WL 966317, at *4 (Tex. App.—Fort Worth May 6, 2004, no pet.) (mem. op.) 

24:
J.T.G.
, 
121 S.W.3d at 133. 

25:
Boyd
, 727 S.W.2d at 533; 
R.W.
, 129 S.W.3d at 743-44
.   

26:
Where multiple grounds for termination are alleged, only one predicate finding under section 161.001(1) is necessary to support a judgment of termination.
  
A.V.
, 113 S.W.3d at 362.  
Because we find that Robert engaged in conduct that endangered the physical or emotional well-being of H.H. and R.H. under section 161.001(1)(E), we need not address the remaining statutory grounds for termination that were found by the jury.

27:
Holley v. Adams
, 544 S.W.2d 367, 371-72 (Tex. 1976). 

28:
C.H
., 89 S.W.3d at 27.

29:
Id.

30:
Id.

31:
See In re J.F.C.
, 96 S.W.3d 256, 264-68 (Tex. 2002) (discussing legal sufficiency review);
 C.H.
, 89 S.W.3d at 25 (discussing factual sufficiency review)
.